**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | |
|---|---|
| **KREISLER DRUG CO., INC., KREISLER DRUG NO. 3, and KREISLER CLINIC PHARMACY, INC.,** )<br>)<br>)<br>)<br>    Plaintiffs/Counter-Defendants, )<br>)<br>v. )<br>)<br>**MISSOURI CVS PHARMACY, LLC,** )<br>)<br>    Defendant/Counter-Plaintiff/ )<br>    Third-Party Plaintiff, )<br>)<br>v. )<br>)<br>**JAMES J. NABER, SAMUEL KERNOHAN, DAVID HUBBLE, RYAN SUMMERS, and SUMMERS PHARMACY, INC.,** )<br>)<br>    Third-Party Defendants. ) | Civil Action Number<br>14-01050-CV-W-JTM |

## ORDER

In 2012, Missouri CVS Pharmacy, LLC ("CVS"), which owns and operates a chain of pharmacies, entered into an agreement to purchase the assets and prescription files of three independent pharmacies located in Clinton, Missouri. The three pharmacies were operated by Kreisler Drug Co., Inc., Kreisler Drug No. 3, and Kreisler Clinic Pharmacy, Inc. (collectively "Kreisler"). Following the execution of an Asset Purchase and Sale Agreement ("APSA"), several disputes arose between the parties with Kreisler alleging that it is still owed substantial monies under the terms of the APSA and CVS countering that Kreisler had breached the APSA (in particular, in conjunction with the circumstances surrounding the opening of a new independent pharmacy in Clinton by Ryan Summers in 2013).

In 2014, Kreisler instituted an action against CVS in the Circuit Court of Henry County asserting that CVS still owed Kreisler a payment of $100,000 under the terms of the APSA. CVS subsequently removed the case to this Court and filed a Counterclaim/Third-Party Petition against Kreisler, James Naber, Samuel Kernohan, David Hubble, Ryan Summers, and Summers Pharmacy Inc. alleging: (1) breach of the APSA by Kreisler, (2) breach of a guaranty against Naber, Kernohan, and Hubble (the individual shareholders of Kreisler), (3) unjust enrichment against Kreisler, (4) breach of the ASPA against Naber, (5) misappropriation of trade secrets against Mr. Summers and Summers Pharmacy, and (6) tortious interference with a contractual relationship against Mr. Summers and Summers Pharmacy. A long and contentious period of discovery ensued. With an impending trial date approaching, presently pending before the Court are several dispositive motions, to wit:

(1) Kreisler's motion for summary judgment [Doc. 252];

(2) the motion for partial summary judgment of Kreisler, Naber, Kernohan, and Hubble seeking to limit numerous categories of damages alleged by CVS [Doc. 257];

(3) the motion for summary judgment of Mr. Summers and Summers Pharmacy with regard to CVS' claims for misappropriation of trade secrets and tortious interference [Doc. 261]; and

(4) CVS' motion for summary judgment on its counterclaim and third-party claims and on Kreisler's claim for payment of the final $100,000 under the APSA [Doc. 263].[1]

In light of the overlapping legal arguments and factual considerations, the Court will discuss all of the motions together.

---

[1] In addition, associated with CVS' motion for summary judgment, is a motion of Kreisler, Naber, Kernohan, and Hubble seeking to strike CVS' statement of uncontroverted material facts [Doc. 286].

**The "holdback" provision**

The APSA between CVS and Kreisler included a provision creating a "holdback" of certain monies otherwise immediately payable under the APSA. The provision states:

> The sum of $100,000.00[2] (hereinafter the "Holdback Amount") shall be retained by [CVS] and not paid to [Kreisler] as a reserve to ensure payment of [Kreisler's] indemnification obligations pursuant to this Agreement. However, [Kreisler] will perform a UCC search with the Secretary of State and corresponding Counties for secured creditors two (2) weeks prior to the date of inventory. If there are no further secured creditors other than [Hawthorn Bank] it is agreed that the amount of the holdback shall be reduced to $50,000.00 and the holdback period shall be reduced to six (6) months. CVS shall hold, administer and disburse the Holdback Amount, net of amounts, if any, applied against [Kreisler's] indemnification obligations as provided herein, together with interest at the annual rate of one (1%) percent on all amounts held by [CVS] (net of amounts, if any, applied against [Kreisler's] indemnification obligations hereunder) for Kreisler, pursuant to this Agreement, computed from the Date of Inventory. Following acknowledgement by [Kreisler] or a determination of liability on account of [Kreisler's] indemnification obligations hereunder, CVS shall deduct from the Holdback Amount an amount equal to the damages suffered or incurred and either retain such amount for its own account or make payments directly to the appropriate party. At any time from and after one year from the Date of Inventory[3], [Kreisler] may submit a request to [CVS] to pay, and upon receipt of such request [CVS] shall pay the remaining Holdback Amount, if any, plus interest, if any, minus any amounts held in respect of pending, disputed, or otherwise unpaid claims of [CVS].

As noted above, this "holdback" provision of the APSA was intended by the parties to ensure "payment" of Kreisler's indemnification obligations under the APSA. To that end, the Agreement included a specific term:

---

[2] The entire deal between Kreisler and CVS involved the payment of several million dollars.

[3] The Date of Inventory (as that term was used in the APSA) was ultimately agreed upon as April 13, 2013. On that date, Kreisler closed its Clinton pharmacies. The next day, CVS opened its Clinton pharmacy.

3

> [Kreisler] shall indemnify, defend and hold [CVS] harmless from and
> against any and all losses, costs, expenses, damages or liabilities
> (including court costs and reasonable attorneys' fees) incurred by [CVS]
> arising from (a) any breach of any covenant, representation or warranty
> by [Kreisler] contained in or given in writing pursuant to this Agreement
> or (b) relating to [Kreisler's] possession or use of [Kreisler's] Assets
> being sold hereunder, up to and including the Date of Inventory, or
> resulting from operations, or based on events, acts or omissions of
> [Kreisler] which occurred prior to or on such date.

In reviewing the holdback provision of the APSA, the Court finds that by its plain terms, it contained two separate components. First, if there were no secured creditors of Kreisler – other than Hawthorn Bank, as determined two weeks prior to the Date of Inventory – then the holdback amount retained by CVS would be reduced to $50,000 and the holdback period would be reduced to six months (instead of the original $100,000 with a holdback period of one year). The second component of the holdback provision required CVS to disburse the holdback amount (either $50,000 or $100,000 depending on the first component of the provision) to Kreisler <u>net of amounts</u>, if any, applied against Kreisler's indemnification obligations.

Following the sale of the Clinton pharmacies and the passage of six months, Kreisler demanded from CVS the payment of the $100,000 holdback amount. With regard to the first component of the holdback provision, prior to the closing of the APSA, the lone creditor of Kreisler was Hawthorn Bank. Hawthorn Bank's claim was subsequently satisfied prior to or at the closing, and after the closing there were no secured creditors of Kreisler. CVS, however, refused to reduce the retained holdback amount to $50,000 and refused (and continues to refuse) to pay Kreisler the $50,000. In so doing, CVS breached the APSA and continues to be in breach of the APSA.[4]

---

[4] CVS argues that its breach of this part of the holdback provision is excused because Kreisler materially breached the APSA before CVS. As detailed *infra*, the Court finds that the summary judgment record does not establish any material breach by Kreisler.

With regard to the second component of the holdback provision, CVS has also refused to pay to Kreisler the remaining $50,000 (or, in the actual case, the entire $100,000). Pursuant to the APSA, CVS is permitted to withhold such payment only if Kreisler "acknowledges" a violation of its indemnification obligations under the APSA or there is a "determination of liability" based on Kreisler's indemnification obligations under the APSA. As made clear with the present litigation, Kreisler has never acknowledged any violation. As such, the resolution of whether CVS was and is justified in withholding any or all of the holdback amount turns on whether this Court determines that Kreisler violated its indemnification obligation under the APSA, *i.e.*, whether Kreisler materially breached the APSA. As set out herein, the Court concludes that Kreisler did not materially breach the Agreement.

In defense of its refusal to pay out the holdback amount and in support of its own affirmative claim for damages for breach of contract, CVS argues [Docs. 263 and 285] that Kreisler breached the APSA in one or all of eight respects, to wit:

(a) Kreisler authorized the transfer of its physician database to a competitor (Summers Pharmacy) after the execution of the APSA without CVS' consent;

(b) Kreisler allowed certain key Kreisler employees and technicians to "be employed simultaneously" at Kreisler and Summers Pharmacy;

(c) Kreisler allowed a former employee (Melanie Dehn) to share customer information with Ryan Summers and Summers Pharmacy after the execution of the APSA;

(d) Kreisler shareholders disclosed details of the pharmacy sale to family and friends;

(e) James Naber failed to provide agreed upon consulting services to CVS; and

(f) James Naber and Samuel Kernohan violated a non-competition agreement by airing a radio advertisement heard in Clinton,

5

>       Missouri on behalf of Kreisler Country Pharmacy in Appleton
>       City, Missouri (a pharmacy not involved in the sale at issue in the
>       APSA).

The Court will address each breach allegation in turn for the dual purposes of addressing whether CVS was justified in withholding the holdback amount and whether CVS has a trialworthy claim of breach of contract against Kreisler.

### Transfer of physician database

Kreisler maintained a physician database that contained information regarding approximately 6,000 physicians who had prescribed medication to Kreisler customers over a 20+ year time period. The database included physician names, addresses, phone/fax numbers, NPI numbers, and DEA numbers. Kreisler utilized a software program called "WinRx" that was offered by an Oklahoma company called Computer Rx. According to Computer Rx, it is common for a pharmacy to consent to the releasing of its physician database to another pharmacy that is also utilizing the company's software since all of the information contained in the physician database exists in other public domains and the physician database contains no customer information.

On March 27, 2013, James Naber permitted Ryan Summers to copy Kreisler's physician database because Mr. Summers was installing the same prescription data management software that Kreisler used [WinRx]. Naber views this as a "courtesy" while CVS argues the access was a breach of the APSA.

The APSA specifically provides that Kreisler could not "share with a third party" any of its "RX Data." The APSA defines "RX Data" to include Kreisler's prescription files, records, and data, including hard copies of prescriptions and customer lists. Thus, the Court concludes

6

that the APSA did not forbid the sharing of general physician information and that Naber did not breach the APSA by permitting Ryan Summers to copy the physician database.

## Simultaneous employment

CVS alleges (and the Court assumes to be true) that during a brief period of time, three Kreisler employees [Becky Nelson, Loree Lipe, and Sally Van Winkle] were working for Kreisler (while it was transitioning to CVS) and for Summers Pharmacy, which was in the process of opening locations in Clinton. CVS contends that this simultaneous employment breached the APSA. The APSA contains a specific "non-competition covenant" that, by its plain and express terms, applies only to James Naber, Paul Hendricks, Samuel Kernohan and David Hubble. With regard to all other Kreisler employees, the APSA merely states:

> It is agreed that in the event that . . . any employees of [Kreisler] shall be employed by [CVS], then . . . any individual employee of [Kreisler] shall be an "employee-at-will" of [CVS], and [CVS] shall have no contractual obligation with regard to such employment.

The Court finds no breach of the APSA based on the alleged simultaneous employment of Ms. Nelson, Ms. Lipe, or Ms. Van Winkle. Given the population of Clinton (9,026 in 2013), CVS should not have been surprised that employees of Kreisler might seek employment opportunities with other competing pharmacies in Clinton. If CVS wanted broader coverage for the non-competition restrictions, it should have included additional individuals within the coverage of the APSA.

## Melanie Dehn's sharing of customer information

CVS alleges that, after the Kreisler Clinton pharmacies had closed, a former Kreisler technician (Melanie Dehn) and other former Kreisler employees remotely logged into Kreisler's computer and provided patient information to employees of the Summers Pharmacy. According

7

to CVS, following the execution of the APSA, it was the owner of Kreisler "RX Data" and paragraph 11 of the APSA was breached when these former Kreisler employees accessed information from Kreisler's old computer system.

Paragraph 11 of the APSA, contrary to assertions advanced by CVS, does not impose "limited access" duties on Kreisler:

> (a) After the Date of Inventory, [CVS] shall use commercially reasonable efforts to make [Kreisler's] RX Data available for access to patients and disclosures to other authorized third parties . . . [Kreisler] acknowledges and agrees that notwithstanding the foregoing, [CVS] shall not assume any legal obligations of [Kreisler] relating to uses and disclosures of protected health information made prior to the Date of Inventory. . . .
>
> (b) In addition, [CVS] hereby agrees to make available to [Kreisler] hard copies of [Kreisler's] RX Data if, for a legitimate business reason, [Kreisler] requires copies of [its] RX Data transferred to [CVS] pursuant to this Agreement.

Moreover, CVS has not produced any evidence from which it might be reasonably inferred that Kreisler's stockholders (Nabor, Kernohan and Hubble) were aware of this post-sale sharing of customer information. The sum of CVS' argument in this regard is that since CVS owned the RX Data, "Dehn's actions in disclosing this information are attributable to Kreisler." CVS' jump in "logic" is too attenuated to establish a breach by Kreisler of the APSA – even assuming that Kreisler had a duty to restrict post-sale access by former employees after the completion of the sale.

CVS also argues that, "independent of the APSA," Kreisler violated Missouri's pharmacy regulations by not purging the confidential information it maintained on its computer system. 20 MO. CODE STATE REGS. § 2220-2.300. Perhaps CVS is correct, but, as essentially admitted by CVS, such a violation would not constitute a breach of the APSA. Nor does CVS seek to assert any sort of private right of action or negligence *per se* claim based on a violation of the Missouri

8

pharmacy regulations. In any event, with regard to Section 2220-2.300, the intended beneficiaries of the statute are <u>customers</u> of the regulated pharmacy. The Court is unaware of complaints from customers "aggrieved" by any violation of Section 2220-2.300 by Kreisler.

### The disclosure of the sale to family and friends

According to CVS, James Naber told Ryan Summers on September 27, 2011 that CVS and Walgreens "ha[d] approached" him and Kreisler was "going to consider all options," that the four Kreisler stockholders told their respective wives about the sale after the APSA was signed, and James Naber told his son about the sale after the APSA was signed. To that end, the APSA provided:

> [CVS] and [Kreisler] hereby covenant and agree to keep the information, terms, conditions, and details of any discussion and/or negotiations relating to this Agreement confidential, except to the extent necessary to carry out the party's respective obligations prior to and after the parties execute this Agreement, and further, except as required by court order. Accordingly, neither party will disclose any details concerning any information, terms, conditions, negotiations or transaction to any other person [including], without limitation, employees of [Kreisler (except as required by law), and customers of Kreisler, without first obtaining the other party's written consent, which shall not be unreasonably withheld.

This provision is ridiculously broad and without time constraint. Indeed, read literally, both parties have repeatedly breached the APSA with their multitude of public filings in this case.

The intent of the provision is plainly to keep information about the negotiations and sale from competitors. To that end, the Court, as a matter of law, does not find any disclosures "about the sale" made to wives or children to constitute a <u>material</u> breach of the APSA.

> Materiality is ordinarily a question of fact. If the breach, however, is *de minimis,* the trial court may determine that the breach does not destroy the purpose or the value of the contract and is not material as a matter of law.

*Curt Ogden Equip. Co. v. Murphy Leasing Co.*, 895 S.W.2d 604, 609 (Mo. App. [E.D.] 1995).

A conversation with Ryan Summers – who was contemplating opening a pharmacy in Clinton – is obviously more in line with the intent of the confidentiality provision. However, evidence of a mere disclosure that CVS and another large pharmacy chain had approached Kreisler and that Kreisler was going to consider its options, is insufficient to constitute a material breach as a matter of law of the confidentiality provision of the APSA and its intent to limit dissemination of "any details concerning any information, terms, conditions, negotiations or transaction" between Kreisler and CVS.

### Naber's consulting services to CVS

The APSA provided that the stockholders of Kreisler (James Naber, Samuel Kernohan, David Hubble) would assist in the transition by providing consulting services to CVS. Specifically, the APSA reads:

> Subsequent to the Closing as defined herein, [CVS] shall engage the Stockholders as consultants for a total period of ten (10) weeks (the "Consulting Period") as each Stockholders [*sic*] availability provides. During the Consulting Period, Stockholders shall assist [CVS] in the orderly transition of business and in such other operational matters as [CVS] shall request. The parties agree that the Stockholders shall provide consulting services for approximately thirty (30) hours per week and shall be compensated at the rate of $60 hr. Consulting services shall be provided at [CVS'] store or at such other location in reasonable proximity to [CVS'] store as requested by CVS.

CVS claims that James Naber refused to provide consulting services to CVS as required by the APSA. As support for this contention, CVS directs the Court to pages 226 and 227 of Mr. Naber's deposition. The Court has reviewed those deposition pages and finds nothing related to Naber's refusal to provide consulting services to CVS. In another pleading, CVS directs the Court to paragraph 62 of its Statement of Uncontroverted Material Facts. Again that reference does not address consulting services. By contrast, the summary judgment record includes the following affidavit testimony by Mr. Naber:

10

> I further state that, together with the other shareholders, I provided consulting services for approximately 30 hours per week for 10 week[s] following the closure of Kreisler Pharmacies.

With this record, the Court does not find a breach of the APSA *viz-a-viz* Mr. Naber's obligation to provide consulting services to CVS.

### The advertisement for the Appleton City pharmacy

Even following the sale of their Clinton pharmacies, James Naber and Samuel Kernohan continued to act as part-owners of Kreisler Country Pharmacy in Appleton City, Missouri. In January of 2014, the Appleton City pharmacy ran radio advertisements that stated:

> Over the last 25 years Kreisler Country Pharmacy has filled thousands of prescriptions . . . , and advised countless parents on the right over-the-counter medication for their kids. And they're always happy when you stop in. But if you can't make it in the store . . . now you can order your prescriptions online. Just go to KreislerCountryPharmacy.com and follow the on-screen instructions. Kreisler Country Pharmacy in Appleton City and now online at KreislerCountryPharmacy.com.

In his deposition, Naber admitted that the radio advertisement could be heard by residents of Clinton, Missouri. CVS argues that this radio advertisement violated the non-compete clause in the APSA.

The ASPA non-competition covenant contains three distinct parts. First, the APSA provides that the shareholders of Kreisler (including Mr. Naber and Mr. Kernohan) could not be "employed by form, acquire, invest in, finance, own, operate, manage, assist, support [or] provide directly or indirectly with . . . an enterprise (a "Competing Business") which is engaged in the business of any pharmacy, drug store and/or health and beauty aid store operation" within 10 miles of Clinton, Missouri. The Court takes judicial notice that the distance between Clinton, Missouri and Appleton City, Missouri is approximately 20 miles and, more to the point, is greater than 10 miles.

11

Second, the non-competition covenant provides that the shareholders of Kreisler (including Mr. Naber and Mr. Kernohan) could not "hire, engage, employ or interfere with or attempt to hire, engage, employ or interfere with any employees, representatives or agents of [CVS]." This provision has no applicability to the radio advertisement.

Finally, the non-competition covenant provides that the shareholders of Kreisler (including Mr. Naber and Mr. Kernohan) could not "call upon, solicit, advise or otherwise do or attempt to do, business with any clients, suppliers, customers or accounts of the business of [Kreisler's Clinton pharmacy] or [CVS] or take away or interfere or attempt to take away or interfere with any custom, trade, business or patronage of the business of [Kreisler's Clinton pharmacy] or [CVS]." The Court finds that the radio advertisement for the Appleton City store did not run afoul of the APSA. CVS was aware of the ownership interest in the Appleton City pharmacy but did not include that store in its purchase under the APSA. A subsequent radio advertisement directed to customers of the Appleton City pharmacy and informing them of new online services is not an effort to "poach" Clinton customers and is not a breach of the APSA.

To sum up then, based on the summary judgment record before the Court, the Court concludes that CVS materially breached the APSA by refusing to pay Kreisler the $100,000 holdback amount. Moreover, that breach was not excused or diminished by any prior breach by Kreisler. In addition, to the extent that CVS seeks affirmative damages from Kreisler and/or the Kreisler shareholders[5] for alleged breaches of the APSA, the Court finds that the record establishes that no material breaches have been established as a matter of law.

---

[5] CVS asserts claims against all of the shareholders individually based on their "guaranty" of the APSA, Naber individually for failing to provide consulting services, and against Naber and Kernohan individually for breaching the non-competition provision of the APSA.

12

In light of the Court's finding that neither Kreisler nor the Kreisler shareholders breached the APSA with CVS, the Court need not address the portions of the summary judgment motion of Kreisler and the Kreisler shareholders seeking to prevent CVS from recovering for lost profits, for loss of goodwill, or for CVS' costs associated with building its pharmacy in Clinton. In addition, CVS' claim for unjust enrichment is legally obviated. In addition, in light of the finding of no breach, the Court further need not address Kreisler's argument regarding CVS' "acceptance of goods" as set out in Mo. Rev. Stat. § 400.2-606.

Finally, the Court turns to the summary judgment filed by Ryan Summers and Summers Pharmacy with regard to CVS' remaining claims that those parties misappropriated trade secrets and tortiously interfered with CVS' contract.

With regard to the misappropriation of trade secrets claim, CVS has plead:

> A list of Kreisler prescriptions customers, along with their contact information, the types of prescriptions they filled over the years, the pricing and brands of those prescriptions, the list of their physicians, their insurance information, and the other components of Kreisler's prescription files purchased by CVS constituted valuable trade secrets.
> . . .
> [B]y methodically contacting Kreisler customers using Kreisler prescription files and customer lists, [Ryan Summers and Summers Pharmacy] managed to transfer approximately 60% of Kreisler prescriptions to Summers Pharmacy within the first two weeks of Summers Pharmacy's opening, and before the CVS store even opened.

Ryan Summers and Summers Pharmacy argues that CVS had no protectable trade secret that was misappropriated by the Summers defendants as defined by the Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. §§ 417.450, *et seq*.

A viable claim under the Missouri statute requires that CVS establish (1) a protectable trade secret, (2) misappropriation of the trade secret by the Summers defendants, and (3)

13

attendant and resulting damages to CVS. *Central Trust and Inv. Co. v. Signalpoint Asset Management, LLC,* 422 S.W.3d 312, 320 (Mo. 2014) (*en banc*).

As noted above, CVS' pleading focuses on the "lists" that comprise the "components of Kreisler's prescription files purchased by CVS." The emphasis on lists is appropriate. Nearly all of the data at issue involve information known to third parties (hence, not secret). Each individual pharmacy customer either knows his or her personal information and medication list or can readily access such information. However, as conceded by the Summers defendants, the "compilation" of such items itself may constitute a trade secret. Accordingly, the initial question is whether the Summers defendants misappropriated Kreisler's compilation of its customers' prescription files.[6] The Court concludes that the summary judgment record establishes that they did not.

With regard to the Kreisler physician database (discussed *supra*), even assuming that this was a protectable secret of CVS,[7] the Summers defendants did not misappropriate the database. Access to the physician database was <u>requested</u> by the Summers defendants and any transfer of physician information only occurred after James Naber <u>consented</u> to the access. This was not misappropriation which Missouri law defines as:

(a) Acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or

---

[6] To be clear, the Court finds that the customer-specific information for any individual customer is not a trade secret. *Compare Western Blue Print Co. LLC v. Roberts,* 367 S.W.3d 7 (Mo. 2012) (*en banc*) ("customer contact" information is not a protected trade secret); *Tension Envelope Corp. v. JBM Envelope Co.*, 2015 WL 893242, at *8 (W.D. Mo. Mar. 3, 2015) (customer-specific service requirements are not protected trade secrets because the information could have been acquired from the customers themselves).

[7] The access to the physician database afforded to Ryan Summers occurred at a time when Kreisler still owned the information. Moreover, as indicated by Computer Rx, it was not uncommon for its customers to share physician databases – hardly an example of a trade secret.

(b) Disclosure or use of a trade secret of a person without express or implied consent by another person who:

    a. Used improper means to acquire knowledge of the trade secret; or

    b. Before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake; or

    c. At the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

        i. Derived from or through a person who had utilized improper means to acquire it;

        ii. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

        iii. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

MO. REV. STAT. § 417.453(2). The Summers defendants' acquisition of the physician database was not accomplished through improper means.

CVS also complains about the misappropriation of the Kreisler "RX Data" (as defined in the APSA). However, the summary judgment record does not establish that such information – as a compilation – was ever obtained by the Summers defendants. At best, the record shows that many customers of Kreisler <u>individually</u> requested that their prescriptions be transferred to Summers Pharmacy in the two-week period of time between when Summers Pharmacy opened and when CVS opened its Clinton Pharmacy and for a period of time thereafter.

The choice of a pharmacy lies with an individual customer. Indeed, in 2013, Missouri regulations required pharmacies to process and complete a customer's request to transfer prescription services within one business day of receiving the request. 20 MO. CODE STATE

REGS. § 2220-2.120. In this case, based on the record before the Court, there is <u>no evidence</u> that any customer's prescriptions were transferred without the request of the individual customer. There is some evidence that Kreisler employees accessed the Kreisler RX Data so as to assist an individual customer in transferring prescription services. However, the record does not establish that these efforts were organized by the Summers defendants or that the Summers defendants ever obtained or acquired the Kreisler RX Data. CVS' claim of misappropriation of trade secrets fails as a matter of law.

CVS also claims that the Summers defendants tortuously interfered with its contract with Kreisler. To state a claim for tortious interference, CVS must be able to establish (1) a valid contract; (2) the Summers defendants' knowledge of the contract; (3) a breach of the contract caused by the Summers defendants' intentional interference; (4) absence of justification; and (5) damages. *AIG Agency, Inc. v. Missouri Gen. Ins. Agency, Inc.*, 474 S.W.3d 222, 230 (Mo. App. [E.D.] 2015). As previously discussed herein, the Court does not find that Kreisler breached the APSA, must less that the Summers defendants induced such a breach.

Therefore, and in accordance with the foregoing discussion, it is

**ORDERED** that Kreisler's motion for summary judgment [Doc. 252] is **GRANTED**. It is further

**ORDERED** that the motion for partial summary judgment of Kreisler, Naber, Kernohan, and Hubble seeking to limit numerous categories of damages alleged by CVS [Doc. 257] is **FOUND AS MOOT**. It is further

**ORDERED** that the motion for summary judgment of Mr. Summers and Summers Pharmacy with regard to CVS' claims for misappropriation of trade secrets and tortious interference [Doc. 261] is **GRANTED**. It is further

**ORDERED** that CVS' motion for summary judgment on its counterclaim and third-party claims and on Kreisler's claim for payment of the final $100,000 under the APSA [Doc. 263] is **DENIED**.

>    */s/ John T. Maughmer*
> **John T. Maughmer**
> **United States Magistrate Judge**

17

Case 4:14-cv-01050-JTM   Document 321   Filed 10/04/16   Page 17 of 17